[Cite as *State v. Thompson*, 2023-Ohio-2942.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
NOBLE COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

TYLER THOMPSON,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 21 NO 0487

---

Criminal Appeal from the
Court of Common Pleas of Noble County, Ohio
Case No. 221-2032

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jordan C. Croucher*, Noble County Prosecuting Attorney, 150 Courthouse, Caldwell, Ohio 43724 and *Atty. James L. Lowe*, Section Chief, Office of the Ohio Attorney General, Special Prosecutions, 30 East Broad Street, 23rd Floor, Columbus, Ohio 43215, for Plaintiff-Appellee and

*Atty. Rhys Brendan Cartwright-Jones*, 42 N. Phelps Street, Youngstown, Ohio 44503, for Defendant-Appellant.

Dated: August 22, 2023

**HANNI, J.**

{¶1}   Defendant-Appellant, Tyler Thompson, appeals from a Noble County Common Pleas Court judgment convicting him of aggravated murder and tampering with evidence, following a jury trial.

{¶2}   Appellant and Leah Hines began dating in 2016.  They eventually moved in together and had two children.

{¶3}   In the early morning hours of March 21, 2021, Appellant's mother called 911 to report a shooting at Appellant's trailer.  When law enforcement arrived on the scene they found Hines had been shot.  She was pronounced dead at the scene.  Appellant's mother and grandmother were also at the scene tending to Appellant's and Hines's five-month old son.

{¶4}   Law enforcement was informed by Appellant's mother that Appellant was down the driveway at her trailer.  When asked what happened, Appellant told the responding officers that he shot Hines.  Appellant was subsequently arrested.

{¶5}   On April 14, 2021, a Noble County Grand Jury indicted Appellant on one count of aggravated murder, an unspecified felony in violation of R.C. 2903.01(A), with an accompanying firearm specification; one count of murder, an unspecified felony in violation of R.C. 2903.02(A), with an accompanying firearm specification; one count of murder, an unspecified felony in violation of R.C. 2903.02(B), with an accompanying firearm specification; and one count of tampering with evidence, a third-degree felony in violation of R.C. 2921.12(A)(1).  Appellant entered a not guilty plea.

{¶6}   The matter proceeded to a four-day jury trial beginning on October 12, 2021.  The jury found Appellant guilty on all counts.  The trial court set the matter for sentencing.

{¶7}   At the sentencing hearing, the parties stipulated that the aggravated murder and two murder convictions all merged for sentencing purposes.  The State elected to proceed on the aggravated murder conviction.  The court then sentenced Appellant to life in prison without parole on the aggravated murder conviction with an additional three years on the firearm specification to be served consecutively.  It also sentenced Appellant

to 24 months in prison on the tampering with evidence conviction to be served concurrently with the aggravated murder sentence.

{¶8} Appellant filed a timely notice of appeal on December 22, 2021. He now raises four assignments of error for our review.

{¶9} Appellant's first assignment of error states:

THE TRIAL COURT ERRED IN ALLOWING A CONVICTION ON INSUFFICIENT EVIDENCE, CONTRARY TO THE FOURTEENTH AMENDMENT'S DUE PROCESS REQUIREMENT.

{¶10} Appellant asserts his convictions are not supported by sufficient evidence.

{¶11} As to his aggravated murder conviction, Appellant claims the State failed to offer any evidence of prior calculation and design. He claims there was no evidence that he planned ahead to shoot Hines. The fact that he had a gun, Appellant argues, is irrelevant because he routinely carried firearms. Further, he argues that his recent purchase of a firearm was a spur-of-the-moment purchase. Appellant contends there was no evidence that he sought out a firearm to prepare for a murder.

{¶12} As to his tampering with evidence conviction, Appellant claims the State failed to offer evidence that he had knowledge of an official proceeding or that he had an intent to impair the gun's evidentiary value.

{¶13} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113. When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Thorn*, 7th Dist. Belmont Nos. 16 BE 0054, 17 BE 0013, 2018-Ohio-1028, ¶ 34, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273,

574 N.E.2d 492 (1991) (superseded by state constitutional amendment on other grounds).

**{¶14}** A sufficiency of the evidence challenge tests the burden of production while a manifest weight challenge tests the burden of persuasion. *Thompkins* at 390 (Cook, J., concurring). Therefore, when reviewing a sufficiency challenge, the court does not evaluate witness credibility. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Instead, the court looks at whether the evidence is sufficient if believed. *Id.* at ¶ 82.

**{¶15}** The jury convicted Appellant of aggravated murder in violation of R.C. 2903.01(A), which provides in relevant part: "No person shall purposely, and with prior calculation and design, cause the death of another[.]"

**{¶16}** The jury also convicted Appellant of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"

**{¶17}** We must consider the evidence presented by the State to determine if any rational trier of fact could have found the essential elements of each crime proven beyond a reasonable doubt.

**{¶18}** Noble County Sheriff's Deputies Brian Langley and Edward Lowe were dispatched to Appellant's trailer at 1:37 a.m. on the day in question in response to a report of gunshots. (Tr. 63-64).

**{¶19}** Dep. Langley testified that he responded to the scene to find Hines dead on the couch. (Tr. 53-54). Appellant's mother and grandmother were also there, one of them holding Appellant's and Hines's baby. (Tr. 52-53).

**{¶20}** Dep. Lowe testified that Appellant's mother informed them that Appellant had been at the trailer and he was now down the driveway at her residence. (Tr. 67-68). Dep. Lowe went down the driveway to the next residence and found Appellant and his father outside. (Tr. 68-69). Dep. Lowe asked Appellant what was going on and Appellant responded, "I had enough. I did it." (Tr. 70). Appellant informed the deputy that he had a knife on his person. (Tr. 70). Dep. Lowe asked Appellant, "Is that what you used?" to

which Appellant responded, "No. I shot her." (Tr. 71). Dep. Lowe placed Appellant in handcuffs and placed him in the patrol car. (Tr. 71-73). Noble County Sheriff Jason Mackie arrived next and instructed the deputies to transport Appellant to the sheriff's office. (Tr. 73-75). Before they left, Dep. Lowe asked Appellant where the firearm was. (Tr. 74). Appellant told the deputy it was under the couch. (Tr. 74).

{¶21} Matthew Austin is a special agent with the Ohio Bureau of Criminal Identification and Investigation (BCI). He was asked to assist in the investigation in this case. (Tr. 85). Austin processed and photographed the crime scene. He searched the couch where Hines was shot. He found a black Walther handgun underneath the couch cushions. (Tr. 100). Austin also photographed Hines's right shoulder with the suspected gunshot wound. (Tr. 104). Austin opined, based on melting and sootiness of the bullet hole, that Hines was shot from a close distance. (Tr. 104-105).

{¶22} Jeffrey Hill is Appellant's cousin. Hill testified that on March 20, 2021, he and his son were visiting from out-of-town at his mother's house. (Tr. 137-138). Appellant stopped there to visit with them. (Tr. 138-139). Hill stated that he and Appellant were talking about hunting and fishing. (Tr. 139). Hill mentioned a gun he would like to purchase. (Tr. 141-142). The conversation turned to a Walther handgun Hill currently had in his truck. (Tr. 142). Appellant offered to purchase the Walther handgun from Hill. (Tr. 142). The two men went to Hill's truck where Hill cleared the chamber and took the magazine out of the gun and showed it to Appellant. (Tr. 142-143). Appellant purchased the Walther handgun for $400 cash from Hill. (Tr. 143). Hill gave Appellant the gun in two pieces, the firearm and the magazine. (Tr. 143, 145). Hill saw Appellant place the gun in either the glovebox or the center console of Appellant's vehicle and place the magazine in the cup holder. (Tr. 143).

{¶23} Ashley Cady shares a six-year-old son with Appellant. Cady testified that on the morning of March 20, 2021, Appellant called her and asked her to go with him to buy a gun. (Tr. 153-154). She did not go with him because she was at work. (Tr. 154). Appellant called her later at approximately 1:30 a.m. on March 21, and told her he loved her and loved their son. (Tr. 154-155). Appellant further told Cady that he was sorry and that he was going away for a long time. (Tr. 155). He told Cady that he shot Hines but that he did not remember doing it. (Tr. 156).

{¶24} Michelle Thompson is Appellant's mother. Thompson lives in a mobile home with her husband. (Tr. 182). Her property also has another mobile home where Appellant lived with Hines and the couple's infant son, Maddox. (Tr. 183).

{¶25} Thompson testified that on March 21, 2021, sometime after 1:30 a.m., Appellant came to her home. (Tr. 186). Appellant told Thompson, "I couldn't take it anymore. I shot her. Go check on her." (Tr. 187). Thompson stated she knew Appellant was talking about Hines so she went to their trailer. (Tr. 187). She found Hines unresponsive on the couch. (Tr. 187). Maddox was also laying on the couch crying. (Tr. 187). Thompson picked Maddox up and called 911. (Tr. 189).

{¶26} Sheriff Mackie responded to the scene on the night in question. When he arrived, he met Appellant and Dep. Lowe in the driveway. (Tr. 193). Sheriff Mackie advised Appellant of his *Miranda* rights. (Tr. 193). He then asked Appellant what had happened. (Tr. 194). Appellant told the sheriff he had enough and he thought he had killed Hines. (Tr. 194). The sheriff stated that Dep. Lowe then asked Appellant where the gun was located and Appellant responded that it was under the couch. (Tr. 194). Sheriff Mackie stated that he interviewed Appellant the next day. Appellant told the sheriff that he did not remember the actual shooting. (Tr. 197-198).

{¶27} Lieutenant Brett McKee investigated this matter. Lt. McKee interviewed Appellant at approximately 2:30 a.m. and again at approximately 12:40 p.m. on the day of the murder. (Tr. 210). The lieutenant asked Appellant if he and Hines had been fighting. (Tr. 215). Appellant's response was, "She was lying on the couch and she wasn't even fighting." (Tr. 215). He also stated, however, that earlier that day Hines had been "running her mouth" and had sent him 73 text messages that he did not read. (Tr. 218). Lt. McKee asked Appellant if he said anything to Hines before he shot her. (Tr. 217). Appellant told the lieutenant he told Hines he loved her. (Tr. 217). The lieutenant asked Appellant where he shot Hines, and Appellant responded, "through the chest." (Tr. 216). Appellant also told the lieutenant that he reported to his parents that he accidentally shot Hines. (Tr. 220). Lt. McKee asked Appellant where his son had been. (Tr. 220). Appellant stated that he thought the baby was laying in his "Boppy" pillow on the couch with Hines. (Tr. 220). Appellant never told Lt. McKee that he believed the baby was laying in an unsafe position. (Tr. 221). The lieutenant asked Appellant if Hines was doing

anything that made him mad and Appellant mentioned Hines had been arrested for shoplifting. (Tr. 222).

{¶28} Dr. Charles Lee is a forensic pathologist who conducted the autopsy in this case. He testified that Hines had been shot with a gun against her back. (Tr. 255-256).

{¶29} The above evidence, when construed in favor of the State, is sufficient to support the aggravated murder conviction. The only element Appellant asserts the State failed to prove was that he acted with prior calculation and design. But the State presented evidence that, taken as a whole, supports a finding of prior calculation and design.

{¶30} Cady testified that Appellant called her early in the day and asked her to go with him to purchase a gun. Later that day, Appellant purchased a gun from his cousin, paying with cash. At that time, the gun was not loaded and the magazine was separate from the gun. This evidence tends to demonstrate that Appellant set out to buy a gun on the day in question. When he did purchase the gun, it was unloaded and in two parts. So later, he had to purposely put the gun back together before he could use it to shoot Hines.

{¶31} Additionally, just after the shooting Appellant told his mother that he "couldn't take it anymore" and he shot Hines. Appellant reiterated this statement to the sheriff. And he told Lt. McKee that before the shooting, he and Hines had not been fighting instead, "[s]he was lying on the couch." Appellant told the lieutenant that he told Hines he loved her and then shot her through the chest.

{¶32} This evidence, construed in favor of the State as is required in a sufficiency challenge, is sufficient to support the element of prior calculation and design needed to prove aggravated murder. Appellant purchased a gun that day, with cash, and later assembled and loaded it. He then went to the trailer he shared with Hines, with the loaded gun, and found Hines lying on the couch. He told her he loved her and then shot her through the chest.

{¶33} As to Appellant's tampering with evidence conviction, he asserts the State did not prove the element that he had knowledge of an official proceeding or that he had an intent to impair the gun's evidentiary value when he hid the gun under the couch cushions.

Case No. 21 NO 0487

**{¶34}** Because homicides are highly likely to be discovered and investigated, a jury may reasonably believe that a murderer knows this. *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 118. Knowledge of a likely investigation may be inferred when the defendant commits a crime that is likely to be reported, such as a homicide. *Id.* Thus, in this case, where Appellant committed a homicide, it was reasonable for the jury to infer that Appellant knew an investigation was likely when he concealed the gun under the couch cushions. Therefore, sufficient evidence supports the tampering with evidence conviction.

**{¶35}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

**{¶36}** Appellant's second assignment of error states:

TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO SUPPRESS A STATEMENT THAT WAS THE RESULT OF A CUSTODIAL INTERROGATION.

**{¶37}** At trial, Deputy Edward Lowe testified that he responded to the scene of the shooting. When he arrived at the scene, Dep. Lowe went into the trailer and found the victim, who appeared to be deceased, on the couch. (Tr. 66). Two women were also present. (Tr. 66). One of the women stated that her son, Appellant, had been at the trailer but he was now down the driveway at her house. (Tr. 67-68). Dep. Lowe went to the next residence down the driveway and asked where Appellant was. (Tr. 69). Appellant raised his hands and identified himself. (Tr. 69). Appellant's father was with Appellant and also identified himself. (Tr. 69). Appellant came to meet Dep. Lowe in the driveway and said, "I wanted to let you know I have a knife." (Tr. 70). Dep. Lowe responded by telling Appellant to keep his hands where the deputy could see them and gave him permission to finish his cigarette. (Tr. 70). Dep. Lowe then asked Appellant, "What's going on?" (Tr. 70). To which Appellant stated, "I had enough. I did it." (Tr. 70). The deputy did not ask any more questions at that point. (Tr. 70). Appellant again asked if he could finish his cigarette and the deputy gave him permission to do so. (Tr. 70).

**{¶38}** Dep. Lowe then instructed Appellant to turn around and put his hands behind his back. (Tr. 70). Appellant again informed the deputy that he had a knife. (Tr.

Case No. 21 NO 0487

70).  Dep. Lowe then asked Appellant, "Is that what you used?"  (Tr. 71).  To which Appellant responded, "No.  I shot her."  (Tr. 71).  The deputy did not ask any follow up questions.  (Tr. 71).  He handcuffed Appellant at that time.  (Tr. 71-72).

**{¶39}** In this assignment of error, Appellant contends his counsel was ineffective for failing to move to suppress the statement "No. I shot her" that he made to the deputy before he was given his *Miranda* warning.  He asserts this error was prejudicial to him because there was not overwhelming evidence in this case.  Thus, Appellant argues, without evidence of this statement, the result of trial would likely have been different.

**{¶40}** To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test.  First, the appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.  Second, the appellant must demonstrate that he was prejudiced by counsel's performance.  *Id.*  To show that he has been prejudiced by counsel's deficient performance, the appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

**{¶41}** The appellant bears the burden of proof on the issue of counsel's ineffectiveness.  *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).  In Ohio, a licensed attorney is presumed competent.  *Id.*

**{¶42}** "*Miranda* [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] requires that an individual be warned prior to any questioning that he has the right to remain silent; that anything he says may be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney one will be appointed for him."  *State v. Behnke*, 7th Dist. Columbiana No. 84-C-30, 1985 WL 7049, * 4 (Sept. 30, 1985).

**{¶43}** Appellant cannot satisfy either prong of the *Strickland* test.  As to the first prong, there was likely no point for trial counsel to file a motion to suppress the statement Appellant made to Dep. Lowe.  Counsel would have known that Appellant also confessed to Lt. McKee and Sheriff Mackie, who provided him with his *Miranda* warnings before Appellant confessed to shooting Hines.  Appellant additionally confessed to his mother

and to Cady. Thus, given the fact that Appellant confessed to at least four other people, who all testified as to Appellant's confession, we cannot say that counsel's failure to file a motion to suppress Appellant's statement to Dep. Lowe fell below an objective standard of reasonable representation. For the same reasons, Appellant cannot show prejudice. Appellant confessed to shooting Hines to at least four other people. He also took the stand and admitted to shooting Hines. Thus, Appellant cannot demonstrate that but for Dep. Lowe's testimony regarding his confession, the outcome of the trial would have been different.

{¶44} Accordingly, Appellant's second assignment of error is without merit and is overruled.

{¶45} Appellant's third assignment of error states:

THE TRIAL COURT ERRED IN DECLINING TO ENTER A JURY INSTRUCTION ON VOLUNTARY MANSLAUGHTER.

{¶46} At the conclusion of the evidence, Appellant's counsel requested that the trial court include a jury instruction on voluntary manslaughter. (Tr. 356-366). The State argued that such an instruction was not warranted in this case. (Tr. 356-366).

{¶47} The trial court considered the parties' arguments in light of *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992). (Tr. 373). It concluded there was not reasonable, sufficient evidence of serious provocation by the victim to cause Appellant to act under the influence of a sudden passion or in a sudden fit of rage to incite Appellant to use deadly force. (Tr. 374). The court found that at the time of the offense, the victim did very little, if anything, to provoke Appellant. (Tr. 374). Therefore, the court determined the voluntary manslaughter instruction was not warranted.

{¶48} Appellant now argues there was evidence to support an acquittal on the murder charges and a conviction on voluntary manslaughter. He asserts he put forth evidence as to his state of mind at the time of the incident that supported a voluntary manslaughter instruction. He claimed at trial that when he entered his trailer on the night in question, he saw his infant son face down in the couch cushions and believed him to be dead. Thus, he claimed, he became enraged and shot Hines.

{¶49} In support of his argument, Appellant relies on an Ohio Supreme Court case and a case from this court both addressing the admissibility of expert testimony to support a defense. In *State v. Nemeth*, 82 Ohio St.3d 202, 694 N.E.2d 1332 (1998), the Court held expert testimony that the defendant suffered from battered child syndrome was relevant and admissible in support of a claim of self-defense or as justification for an instruction on a lesser included offense to murder. *Id.* at 205. And in *State v. Jarrell*, 7th Dist. Mahoning No. 18 MA 0119, 2021-Ohio-2333, this court found expert evidence that the defendant suffered from post-traumatic stress disorder was admissible to explain the psychological effects of long-term sexual abuse he suffered at the hands of the victim in order to justify and support voluntary manslaughter. *Id.* at ¶ 48. Neither of these situations are present in the case at bar, however, and there was no expert testimony in this case.

{¶50} A trial court has discretion in determining whether sufficient evidentiary support was put forth during trial to warrant a jury instruction on a lesser-included offense. *State v. Rucker*, 8th Dist. Cuyahoga No. 105628, 2018-Ohio-1832, ¶ 67. Thus, we will not reverse that decision absent an abuse of discretion. *Id.*

{¶51} Voluntary manslaughter is not a lesser-included offense of murder, but instead is an inferior degree of murder. *Shane*, 63 Ohio St.3d at 632. The elements of voluntary manslaughter are contained within the offense of murder except for one or more additional mitigating elements. *Id.* Even though voluntary manslaughter is not a lesser-included offense of murder, the test for whether a court should give a jury instruction on voluntary manslaughter when a defendant is charged with murder is the same test as when an instruction on a lesser-included offense is sought. *Id.* Therefore, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial reasonably supports both an acquittal on the charge of murder and a conviction for voluntary manslaughter. *Id.*

{¶52} An instruction on the inferior-degree offense of voluntary manslaughter requires more than "some evidence" that the defendant may have acted in such a way as to satisfy the requirements of the voluntary manslaughter statute. *Id.* To warrant such an instruction there must be "sufficient evidence * * * which would allow a jury to

reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense." *Id.* at 632-633.

**{¶53}** Appellant asserts the trial court should have given an instruction on voluntary manslaughter pursuant to R.C. 2903.03(A), which provides in relevant part: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another[.]"

**{¶54}** In considering whether provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, both an objective standard and a subjective standard must be applied. *Shane*, 63 Ohio St.3d at 634. First, under the objective standard, if insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the court must refuse to give a voluntary manslaughter instruction. *Id.* If that is the case, the objective portion of the test is not met, and no subsequent inquiry into the subjective portion is warranted. *Id.* If sufficient evidence of provocation is presented, then "the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.*

**{¶55}** In considering Appellant's argument here, we must consider his testimony in addition to the State's evidence set out previously.

**{¶56}** Appellant testified that he and Hines met in 2016. (Tr. 299). She moved in with him and the couple had two children together. (Tr. 299-300). Their daughter was born in 2019 with methamphetamine in her system and children services became involved. (Tr. 301).

**{¶57}** Appellant testified that on March 20, 2021, he worked all day and night. (Tr. 304). He came home and went to sleep, which angered Hines because she wanted to go out fishing or to a movie with him. (Tr. 305). When he woke up, Appellant stated Hines was threatening to kill their 5-month old son Maddox or to drop Maddox off at the sheriff's department. (Tr. 305). She also threatened to use drugs again. (Tr. 305). Appellant noticed then that Maddox had cigarette burns on his legs, so he took Maddox

and went to his parents' house at approximately 7:00 a.m. (Tr. 306, 308). Appellant also noticed that Maddox had a bad diaper rash. (Tr. 306).

{¶58} Appellant left Maddox with his parents and went off to sell his boat at approximately 11:00 a.m. (Tr. 306, 308). He sold his boat for $1,000 cash. (Tr. 306). Appellant then went fishing. (Tr. 307). All morning, Hines was texting Appellant. (Tr. 308-309). In the texts, Hines threatened to kill herself. (Tr. 309). She also threatened to go back on drugs so that when children services drug tested her, she would test positive and lose custody of Maddox. (Tr. 309). While Appellant was fishing, Hines continued to text Appellant but, because of the lack of cellular service, he did not immediately receive those messages. (Tr. 309-310).

{¶59} After fishing, Appellant stopped to visit his cousin, Jeff Hill, at his uncle's house. (Tr. 310). Appellant's parents brought Maddox there too. (Tr. 310). During this time, Appellant continued to receive messages from Hines threatening to leave Maddox with someone else while she used drugs and killed herself. (Tr. 311).

{¶60} While visiting with Hill, Appellant testified that the subject of buying and selling firearms came up. (Tr. 312). Appellant offered Hill $400 cash to purchase a Walther 9-milimeter pistol that Hill had with him that day. (Tr. 312). Hill agreed and Appellant bought the gun from him. (Tr. 312). At 6:43 p.m., Appellant texted his brother-in-law and asked him if he would like to purchase the Walther pistol from him. (Tr. 313). Appellant's brother-in-law declined. (Tr. 314). During this time, the messages from Hines continued with her now threatening to use drugs, kill Appellant's cat, and to have Maddox turned over to children services. (Tr. 315-316).

{¶61} Appellant stopped at a bar after leaving his uncle's house. (Tr. 314). The messages from Hines continued. (Tr. 316-317). After some time, Appellant went home to his trailer. (Tr. 317). He testified he did not know Hines would be home until he saw her car in the driveway. (Tr. 317). Appellant stated that he grabbed the gun from his console because he did not want to leave it sitting in his truck. (Tr. 317). When he entered his trailer, Appellant stated he placed the gun on the counter. (Tr. 317). He then looked and saw Maddox "facedown in between the couch cushions by [Hines's] feet, and he wasn't moving at all." (Tr. 317). Appellant thought Hines had killed Maddox. (Tr. 317). He testified that Hines was yelling at him about something. (Tr. 317-318). Appellant then

got the gun, walked over, and shot Hines. (Tr. 318). He stated he was angry, mad, and upset at the time. (Tr. 318). He thought of all the threats Hines had made throughout the day. (Tr. 318).

{¶62} On cross-examination, Appellant testified that he was upset all day about the continuous texts from Hines. (Tr. 327). He admitted that immediately after shooting Hines he told his father that he thought he "accidentally" shot Hines. (Tr. 332). He also admitted that he called his ex-girlfriend and told her that he accidentally shot Hines. (Tr. 332). Appellant further admitted that he told the sheriff that he had enough "over years of mental abuse." (Tr. 333). When asked by the prosecutor, "Long, delayed, drawn out, tired of it is what you're saying? Couldn't take it anymore?" Appellant responded, "I was just kind of - - yes, I was tired of it. I walked in, and you see your child laying there." (Tr. 333-334). Appellant also admitted that when he bought the gun that day, it was not loaded and it was in two parts. (Tr. 335). Appellant acknowledged that sometime after he purchased the gun he put the magazine into the gun and charged the handle. (Tr. 341).

{¶63} Appellant acknowledged that on the night in question, after shooting Hines, he spoke to his parents, his ex-girlfriend, Deputy Lowe, Lt. McKee, and Sheriff Mackie. (Tr. 336). He admitted that he did not tell any of them that Maddox was lying face-down in the couch cushions. (Tr. 337-338, 346-347). Appellant admitted this was the first time (at trial) that he told anyone this. (Tr. 347). The prosecutor asked Appellant why he told the lieutenant in his interview that Maddox was lying in his "Boppy" pillow. (Tr. 338). Appellant stated he did not know. (Tr. 338). And when the lieutenant asked Appellant during his interview if Maddox was on the couch, Appellant admitted that he stated he did not remember at that time. (Tr. 338).

{¶64} Appellant also admitted that he never checked to see if Maddox was breathing before he shot Hines. (Tr. 339). He also did not check on him after he shot Hines. (Tr. 341). And he never reported to the police that he believed Hines had harmed Maddox. (Tr. 339).

{¶65} Appellant further acknowledged that Hines sent him a message shortly before the shooting stating that she was concerned for Maddox's health because he had a fever. (Tr. 344). Appellant agreed that was not something someone would say who was going to harm their baby. (Tr. 345).

{¶66} The trial court did not abuse its discretion in deciding not to give a jury instruction on voluntary manslaughter in this case. Appellant claims he was enraged because he walked into his trailer and saw Maddox face down on the couch. Appellant claimed he thought Hines had killed Maddox. But even Appellant's own testimony does not support this theory.

{¶67} Appellant stated that he never checked on Maddox to see if he was breathing, either before or after shooting Hines. He simply shot Hines and then left. Furthermore, Appellant admitted that while he spoke with no less than five people immediately after the shooting, including three members of law enforcement, his mother, and his ex-girlfriend, he never once mentioned to any of them that he thought Hines had killed Maddox. The first time Appellant brought up his alleged reason for shooting Hines was at trial in his defense.

{¶68} Moreover, Appellant testified at length about the text messages from Hines throughout the day leading up to the shooting and how he was fed up and "tired of it." This testimony suggests that Appellant's anger and frustration with Hines was continuing throughout the day and was not brought on by a "sudden passion" or "fit of rage."

{¶69} Additionally, on the day leading up to the shooting, Appellant sold his boat for cash. He paid cash for a gun. He then assembled and loaded the gun prior to going home.

{¶70} Given this evidence, we cannot conclude that the trial court abused its discretion in denying Appellant's request for a jury instruction on voluntary manslaughter.

{¶71} Accordingly, Appellant's third assignment of error is without merit and is overruled.

{¶72} Appellant's fourth assignment of error states:

THE TRIAL COURT ERRED IN IMPOSING A LIFE SENTENCE WITHOUT THE POSSIBILITY OF PAROLE.

{¶73} In his final assignment of error, Appellant argues the trial court erred in imposing a life sentence without the possibility of parole. Specifically, he argues the court did not consider R.C. 2929.12(C)(1) or (2), which provide:

(C) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is less serious than conduct normally constituting the offense:

(1) The victim induced or facilitated the offense.

(2) In committing the offense, the offender acted under strong provocation.

**{¶74}** Appellant argues Hines facilitated the offense in this case. He asserts that for years, and specifically on the day of the murder, Hines bombarded him with text messages threatening to kill their baby, to take Appellant's children away from him, and to kill their pet cat. These same facts, Appellant asserts, demonstrate that he acted under strong provocation.

**{¶75}** Appellant was convicted of aggravated murder. Pursuant to R.C. 2929.03(A)(1), the trial court was required to sentence Appellant to one of four sentences: (1) life imprisonment without parole; (2) life imprisonment with parole eligibility after serving 20 years; (3) life imprisonment with parole eligibility after serving 25 years; or (4) life imprisonment with parole eligibility after serving 30 years. The court here sentenced Appellant to the maximum sentence of life imprisonment without parole.

**{¶76}** A defendant who is convicted of or pleads guilty to a felony may appeal his or her sentence as a matter of right based on various grounds, except as provided in R.C. 2953.08(D). R.C. 2953.08(A). A sentence imposed for aggravated murder or murder is not subject to review under R.C. 2953.08(A). R.C. 2953.08(D)(3).

**{¶77}** The Ohio Supreme Court recently addressed a constitutional challenge to R.C. 2953.08(D)(3). In *State v. Grevious*, Slip Opinion 2022-Ohio-4361, ¶ 11-12, the Court discussed R.C. 2953.08(D):

R.C. 2953.08(D)(3), however, states that a "sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review *under this section.*" (Emphasis added.) Nestled within that limited statutory range is the statute under

Case No. 21 NO 0487

which Grevious was sentenced—R.C. 2929.03. This court has previously held that R.C. 2953.08(D) is unambiguous and "clearly means what it says": a sentence imposed for aggravated murder or murder "cannot be reviewed." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 17. *Porterfield*, however, did not involve a constitutional challenge to the defendant's sentence or to R.C. 2953.08(D) itself.

More recently, this court decided in [*State v.*] *Patrick* [164 Ohio St.3d 309, 2020-Ohio-6803, 172 N.E.3d 952] that R.C. 2953.08(D)(3) does not preclude appellate review of a constitutional challenge to a sentence for aggravated murder. *Patrick* at ¶ 22. We explained that R.C. 2953.08 clearly "does not establish the *only* avenue by which a party may appeal a sentence" (emphasis sic), *Patrick* at ¶ 15, and that, in fact, R.C. 2953.02 also provides a statutory right to appeal a criminal sentence, *Patrick* at ¶ 16. And we concluded that "R.C. 2953.08(D)(3)'s statutory language makes clear that it does not preclude other potential avenues of appellate review," such as an appeal of an aggravated-murder sentence based on constitutional grounds, because R.C. 2953.08(D)(3)'s preclusive language "demonstrates that its scope is limited to the bases of appeal described in R.C. 2953.08," *Patrick* at ¶ 17.

**{¶78}** Thus, the Court left open an avenue for appeal of an aggravated murder sentence on constitutional grounds.

**{¶79}** Although here Appellant couches his argument in terms of an Eighth Amendment violation, the substance of his argument is that the trial court did not properly consider R.C. 2929.12(C)(1) or (2) as indicating that his conduct was less serious than conduct normally constituting the offense. In other words, Appellant argues that his sentence is contrary to law because the trial court did not properly consider the applicable sentencing factors. This is an appeal of his sentence under R.C. 2953.08(A), which is expressly prohibited by the statute for an aggravated murder sentence.

{¶80} Accordingly, Appellant's fourth assignment of error is without merit and is overruled.

{¶81} For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Robb, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Noble County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**