[Cite as *State v. Thompson*, 2024-Ohio-3206.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## NOBLE COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

TYLER THOMPSON,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 NO 0513**

---

Criminal Appeal from the
Court of Common Pleas of Noble County, Ohio
Case No. 221-2032

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jordan C. Croucher,* Noble County Prosecutor, for Plaintiff-Appellee and

*Atty. Kimberly Kendall Corral* and *Atty. Gabrielle M. Ploplis,* for Defendant-Appellant.

Dated: August 21, 2024

**DICKEY, J.**

{¶1} Appellant, Tyler Thompson, appeals the judgment entry of the Noble County Court of Common Pleas dismissing his petition for postconviction relief and request for discovery period and evidentiary hearing, as well as his motion for an order to produce records in aid of postconviction petition. Appellant predicates his petition on alleged ineffective assistance provided by defense counsel. He contends defense counsel's performance was deficient and prejudice resulted from defense counsel's failure to investigate a specific piece of physical evidence, prior to entering a stipulation regarding the evidence. Appellant similarly alleges defense counsel failed to investigate and offer at trial Appellant's prior treatment for mental illness.

{¶2} Appellant advances four assignments of error. First, Appellant argues the trial court abused its discretion when it failed to credit the affidavit of Appellant's sister, Chelssie Hanson, who averred that a stipulation entered into the record at trial mischaracterized a key piece of physical evidence. Second, Appellant contends the trial court abused its discretion in concluding the Hanson affidavit, if believed, did not establish substantive grounds for relief. Third, Appellant argues his affidavit and the affidavit of his mother, Michelle Thompson, in which they aver that Appellant's mental health records were available but not offered at trial in mitigation of felony level and sentence, was not evidence de hors the record, and in the alternative, did not establish substantive grounds for relief. Finally, Appellant asserts the trial court abused its discretion when it denied his motion to produce records. For the following reasons, the judgment entry of the trial court is affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶3} Appellant was convicted by a jury of one count of aggravated murder (prior calculation and design) and two counts of murder, each with corresponding firearms specifications, in the shooting death of Leah Hines, as well as tampering with evidence. The murder convictions were merged with the aggravated murder conviction at sentencing. The trial court imposed life in prison without parole on the aggravated murder conviction, three years on the firearm specification, and 24 months on the tampering conviction, to be served consecutively.

Case No. 23 NO 0513

**{¶4}** We set forth the relevant facts underlying Appellant's convictions in his direct appeal, *State v. Thompson*, 2023-Ohio-2942 (7th Dist.), appeal not allowed, 2023-Ohio-4640:

Appellant and Leah Hines began dating in 2016. They eventually moved in together and had two children.

In the early morning hours of March 21, 2021, Appellant's mother called 911 to report a shooting at Appellant's trailer.

. . .

Noble County Sheriff's Deputies Brian Langley and Edward Lowe were dispatched to Appellant's trailer at 1:37 a.m. on the day in question in response to a report of gunshots. (Tr. 63-64).

Dep. Langley testified that he responded to the scene to find Hines dead on the couch. (Tr. 53-54). Appellant's mother and grandmother were also there, one of them holding Appellant's and Hines's baby. (Tr. 52-53).

Dep. Lowe testified that Appellant's mother informed them that Appellant had been at the trailer and he was now down the driveway at her residence. (Tr. 67-68). Dep. Lowe went down the driveway to the next residence and found Appellant and his father outside. (Tr. 68-69). Dep. Lowe asked Appellant what was going on and Appellant responded, "I had enough. I did it." (Tr. 70). Appellant informed the deputy that he had a knife on his person. (Tr. 70). Dep. Lowe asked Appellant, "Is that what you used?" to which Appellant responded, "No. I shot her." (Tr. 71). Dep. Lowe placed Appellant in handcuffs and placed him in the patrol car. (Tr. 71-73). Noble County Sheriff Jason Mackie arrived next and instructed the deputies to transport Appellant to the sheriff's office. (Tr. 73-75). Before they left, Dep. Lowe asked Appellant where the firearm was. (Tr. 74). Appellant told the deputy it was under the couch. (Tr. 74).

Matthew Austin is a special agent with the Ohio Bureau of Criminal Identification and Investigation (BCI). He was asked to assist in the investigation in this case. (Tr. 85). Austin processed and photographed the crime scene. He searched the couch where Hines was shot. He found a black Walther handgun underneath the couch cushions. (Tr. 100). Austin also photographed Hines's right shoulder with the suspected gunshot wound. (Tr. 104). Austin opined, based on melting and sootiness of the bullet hole, that Hines was shot from a close distance. (Tr. 104-105).

Jeffrey Hill is Appellant's cousin. Hill testified that on March 20, 2021, he and his son were visiting from out-of-town at his mother's house. (Tr. 137-138). Appellant stopped there to visit with them. (Tr. 138-139). Hill stated that he and Appellant were talking about hunting and fishing. (Tr. 139). Hill mentioned a gun he would like to purchase. (Tr. 141-142). The conversation turned to a Walther handgun Hill currently had in his truck. (Tr. 142). Appellant offered to purchase the Walther handgun from Hill. (Tr. 142). The two men went to Hill's truck where Hill cleared the chamber and took the magazine out of the gun and showed it to Appellant. (Tr. 142-143). Appellant purchased the Walther handgun for $400 cash from Hill. (Tr. 143). Hill gave Appellant the gun in two pieces, the firearm and the magazine. (Tr. 143, 145). Hill saw Appellant place the gun in either the glovebox or the center console of Appellant's vehicle and place the magazine in the cup holder. (Tr. 143).

Ashley Cady shares a six-year-old son with Appellant. Cady testified that on the morning of March 20, 2021, Appellant called her and asked her to go with him to buy a gun. (Tr. 153-154). She did not go with him because she was at work. (Tr. 154). Appellant called her later at approximately 1:30 a.m. on March 21, and told her he loved her and loved their son. (Tr. 154-155). Appellant further told Cady that he was sorry and that he was going away for a long time. (Tr. 155). He told Cady that he shot Hines but that he did not remember doing it. (Tr. 156).

Michelle Thompson is Appellant's mother. Thompson lives in a mobile home with her husband. (Tr. 182). Her property also has another mobile home where Appellant lived with Hines and the couple's infant son, Maddox. (Tr. 183).

Thompson testified that on March 21, 2021, sometime after 1:30 a.m., Appellant came to her home. (Tr. 186). Appellant told Thompson, "I couldn't take it anymore. I shot her. Go check on her." (Tr. 187). Thompson stated she knew Appellant was talking about Hines so she went to their trailer. (Tr. 187). She found Hines unresponsive on the couch. (Tr. 187). Maddox was also laying on the couch crying. (Tr. 187). Thompson picked Maddox up and called 911. (Tr. 189).

Sheriff Mackie responded to the scene on the night in question. When he arrived, he met Appellant and Dep. Lowe in the driveway. (Tr. 193). Sheriff Mackie advised Appellant of his Miranda rights. (Tr. 193). He then asked Appellant what had happened. (Tr. 194). Appellant told the sheriff he had enough and he thought he had killed Hines. (Tr. 194). The sheriff stated that Dep. Lowe then asked Appellant where the gun was located and Appellant responded that it was under the couch. (Tr. 194). Sheriff Mackie stated that he interviewed Appellant the next day. Appellant told the sheriff that he did not remember the actual shooting. (Tr. 197-198).

Lieutenant Brett McKee investigated this matter. Lt. McKee interviewed Appellant at approximately 2:30 a.m. and again at approximately 12:40 p.m. on the day of the murder. (Tr. 210). The lieutenant asked Appellant if he and Hines had been fighting. (Tr. 215). Appellant's response was, "She was lying on the couch and she wasn't even fighting." (Tr. 215). He also stated, however, that earlier that day Hines had been "running her mouth" and had sent him 73 text messages that he did not read. (Tr. 218). Lt. McKee asked Appellant if he said anything to Hines before he shot her. (Tr. 217). Appellant told the lieutenant he told Hines he

loved her. (Tr. 217). The lieutenant asked Appellant where he shot Hines, and Appellant responded, "through the chest." (Tr. 216). Appellant also told the lieutenant that he reported to his parents that he accidentally shot Hines. (Tr. 220). Lt. McKee asked Appellant where his son had been. (Tr. 220). Appellant stated that he thought the baby was laying in his "Boppy" pillow on the couch with Hines. (Tr. 220). Appellant never told Lt. McKee that he believed the baby was laying in an unsafe position. (Tr. 221). The lieutenant asked Appellant if Hines was doing anything that made him mad and Appellant mentioned Hines had been arrested for shoplifting. (Tr. 222).

. . .

Appellant testified that he and Hines met in 2016. (Tr. 299). She moved in with him and the couple had two children together. (Tr. 299-300). Their daughter was born in 2019 with methamphetamine in her system and children services became involved. (Tr. 301).

Appellant testified that on March 20, 2021, he worked all day and night. (Tr. 304). He came home and went to sleep, which angered Hines because she wanted to go out fishing or to a movie with him. (Tr. 305). When he woke up, Appellant stated Hines was threatening to kill their 5-month old son Maddox or to drop Maddox off at the sheriff's department. (Tr. 305). She also threatened to use drugs again. (Tr. 305). Appellant noticed then that Maddox had cigarette burns on his legs, so he took Maddox and went to his parents' house at approximately 7:00 a.m. (Tr. 306, 308). Appellant also noticed that Maddox had a bad diaper rash. (Tr. 306).

Appellant left Maddox with his parents and went off to sell his boat at approximately 11:00 a.m. (Tr. 306, 308). He sold his boat for $1,000 cash. (Tr. 306). Appellant then went fishing. (Tr. 307). All morning, Hines was texting Appellant. (Tr. 308-309). In the texts, Hines threatened to kill herself. (Tr. 309). She also threatened to go back on drugs so that when children services drug tested her, she would test positive and lose custody of

Case No. 23 NO 0513

Maddox. (Tr. 309). While Appellant was fishing, Hines continued to text Appellant but, because of the lack of cellular service, he did not immediately receive those messages. (Tr. 309-310).

After fishing, Appellant stopped to visit his cousin, Jeff Hill, at his uncle's house. (Tr. 310). Appellant's parents brought Maddox there too. (Tr. 310). During this time, Appellant continued to receive messages from Hines threatening to leave Maddox with someone else while she used drugs and killed herself. (Tr. 311).

While visiting with Hill, Appellant testified that the subject of buying and selling firearms came up. (Tr. 312). Appellant offered Hill $400 cash to purchase a Walther 9-milimeter pistol that Hill had with him that day. (Tr. 312). Hill agreed and Appellant bought the gun from him. (Tr. 312). At 6:43 p.m., Appellant texted his brother-in-law and asked him if he would like to purchase the Walther pistol from him. (Tr. 313). Appellant's brother-in-law declined. (Tr. 314). During this time, the messages from Hines continued with her now threatening to use drugs, kill Appellant's cat, and to have Maddox turned over to children services. (Tr. 315-316).

Appellant stopped at a bar after leaving his uncle's house. (Tr. 314). The messages from Hines continued. (Tr. 316-317). After some time, Appellant went home to his trailer. (Tr. 317). He testified he did not know Hines would be home until he saw her car in the driveway. (Tr. 317). Appellant stated that he grabbed the gun from his console because he did not want to leave it sitting in his truck. (Tr. 317). When he entered his trailer, Appellant stated he placed the gun on the counter. (Tr. 317). He then looked and saw Maddox "facedown in between the couch cushions by [Hines'] feet, and he wasn't moving at all." (Tr. 317). Appellant thought Hines had killed Maddox. (Tr. 317). He testified that Hines was yelling at him about something. (Tr. 317-318). Appellant then got the gun, walked over, and shot Hines. (Tr. 318). He stated he was angry, mad, and upset at the time. (Tr.

318). He thought of all the threats Hines had made throughout the day. (Tr. 318).

On cross-examination, Appellant testified that he was upset all day about the continuous texts from Hines. (Tr. 327). He admitted that immediately after shooting Hines he told his father that he thought he "accidentally" shot Hines. (Tr. 332). He also admitted that he called his ex-girlfriend and told her that he accidentally shot Hines. (Tr. 332). Appellant further admitted that he told the sheriff that he had enough "over years of mental abuse." (Tr. 333). When asked by the prosecutor, "Long, delayed, drawn out, tired of it is what you're saying? Couldn't take it anymore?" Appellant responded, "I was just kind of -- yes, I was tired of it. I walked in, and you see your child laying there." (Tr. 333-334). Appellant also admitted that when he bought the gun that day, it was not loaded and it was in two parts. (Tr. 335). Appellant acknowledged that sometime after he purchased the gun he put the magazine into the gun and charged the handle. (Tr. 341).

Appellant acknowledged that on the night in question, after shooting Hines, he spoke to his parents, his ex-girlfriend, Deputy Lowe, Lt. McKee, and Sheriff Mackie. (Tr. 336). He admitted that he did not tell any of them that Maddox was lying face-down in the couch cushions. (Tr. 337-338, 346-347). Appellant admitted this was the first time (at trial) that he told anyone this. (Tr. 347). The prosecutor asked Appellant why he told the lieutenant in his interview that Maddox was lying in his "Boppy" pillow. (Tr. 338). Appellant stated he did not know. (Tr. 338). And when the lieutenant asked Appellant during his interview if Maddox was on the couch, Appellant admitted that he stated he did not remember at that time. (Tr. 338).

Appellant also admitted that he never checked to see if Maddox was breathing before he shot Hines. (Tr. 339). He also did not check on him after he shot Hines. (Tr. 341). And he never reported to the police that he believed Hines had harmed Maddox. (Tr. 339).

Appellant further acknowledged that Hines sent him a message shortly before the shooting stating that she was concerned for Maddox's health because he had a fever. (Tr. 344). Appellant agreed that was not something someone would say who was going to harm their baby. (Tr. 345).

*Id.* at ¶ 2-3, 18-27, 56-65.

**{¶5}**   At trial, the parties entered into a stipulation that the "Boppy" pillow was given to Leah's sister on March 22, 2021 "with apparent blood stains on the pillow." (Trial Tr., p. 657.)  A "Boppy" pillow is a curved pillow used to properly position an infant while nursing.  The closed end raises the infant's head, while the infant's buttocks rest in the hollow in the center.

**{¶6}**   During closing argument, defense counsel asserted, "Look at the photos by the way.  See if you can find a Boppy pillow. Who cares about the pillow?  It's the living hell that she promised to put him through and succeeded." (*Id.* at p. 680.)

**{¶7}**   The prosecutor responded in the state's rebuttal:

[Defense counsel] said he cares about this pillow. [According to the transcript, defense counsel said he did not care about the pillow.]  The State would submit that the Defense cares about the pillow because it proves [Appellant] is a liar, because you heard him take the stand and say, "I walked in and saw the baby laying facedown on the couch."  It didn't happen.

He told Detective McKee that [Maddox] was lying in his Boppy pillow, and a Boppy pillow is a little pillow that's designed to keep a baby upright, designed to keep them in place.  But that doesn't match his story.  So eight months later, he's got to tell you he's lying facedown, the baby is dead. What the State [sic] tells you is utterly ridiculous.  That's not what happened.

(*Id.* at p. 685.)

**{¶8}**   In other words, the state relied on the stipulation to contradict Appellant's version of the events at trial that Maddox was face down in the couch cushion and

Case No. 23 NO 0513

appeared to be dead. The stipulation conversely supported Appellant's original version of the events where Maddox was in the Boppy pillow on the couch when Leah was fatally shot, which would explain the presence of blood on the pillow.

## LAW

**{¶9}** We review the decision to dismiss a postconviction petition without a hearing under an abuse of discretion standard of review. *State v. Bunch*, 2022-Ohio-4723, ¶ 25; *State v. Gondor*, 2006-Ohio-6679, ¶ 51-52, citing *State v. Calhoun*, 86 Ohio St.3d 279, 286 (1999). An abuse of discretion occurs if the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Gondor* at ¶ 60.

**{¶10}** A petition for postconviction relief may be filed by a convicted criminal defendant who claims "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States . . . ." R.C. 2953.21(A)(1)(a)(i). The petition shall state the grounds for relief relied upon and may ask the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. *Id.*

**{¶11}** "A criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing." *Calhoun* at 282. Before granting a hearing on the petition for postconviction relief, "the court shall determine whether there are substantive grounds for relief." R.C. 2953.21(D). *See also* R.C. 2953.21(F) (a prompt hearing on the issues is required unless the petition and the files and records of the case show the petitioner is not entitled to relief). In addition to the petition with its supporting affidavits and documentary evidence, the court shall consider all files and records pertaining to the case. R.C. 2953.21(D).

**{¶12}** In general, "a trial court properly denies a defendant's petition for postconviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Calhoun* at 286, paragraph two of syllabus. Before a hearing is scheduled, the petitioner must meet his burden of submitting evidentiary documents with sufficient operative facts to show the raised errors resulted in prejudice. *Id.* at 283, 289.

Notably, if "the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential." *Id.* at 284.

**{¶13}** An ineffective assistance of counsel claim involves both deficient performance and prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). In general, the deficiency in performance must be a serious error falling outside the wide range of reasonable assistance so that the attorney no longer functioned as constitutionally guaranteed counsel. *Id.* Prejudice means a reasonable probability the result would have been different. *Id.* at 693-694 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."). Specifically, before a hearing on a petition alleging ineffective assistance of trial counsel, "the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." *Calhoun* at 283.

**{¶14}** Relevant to the allegations in the petition, *Strickland* requires defense counsel "to make reasonable investigations" before trial. *Strickland* at 691. However, where the record does not indicate the extent of counsel's pretrial investigation, *see State v. Hunter*, 2011-Ohio-6524, ¶ 65, courts in Ohio may not "infer a defense failure to investigate from a silent record." *State v. Were*, 2008-Ohio-2762, ¶ 244.

**{¶15}** Finally, pursuant to the doctrine of res judicata, the petitioner cannot raise issues that were raised or could have been raised at trial or in the direct appeal. *State v. Szefcyk*, 77 Ohio St.3d 93 (1996), syllabus; *State v. Perry*, 10 Ohio St.2d 175, (1967), paragraph four of the syllabus. The direct appeal from a criminal conviction is limited to the trial court record, and prejudicial errors appearing in the record should be raised in the direct appeal rather than in a postconviction petition. *See State v. Cole*, 2 Ohio St.3d 112, 114 (1982) (a postconviction relief petition must avoid the res judicata bar by asserting claims based on evidence de hors the record). A postconviction petition is properly dismissed without a hearing where the claims are barred by res judicata. *State v. West*, 2009-Ohio-3347, ¶ 24-25, 34 (7th Dist.).

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED IN FINDING THAT THE AFFIDAVIT OF CHELSSIE HANSON LACKS CREDIBILITY.**

**{¶16}** According to Hanson's affidavit, she handled the "Boppy" pillow ("pillow") when she packed it for Ashlee Pitts, Leah's sister, who took Maddox into her care on March 22, 2023. Hanson avers there was "absolutely no blood" on the pillow when she relinquished it to the Sheriff's Department for Pitts. (Hanson Aff., ¶ 7.) As a consequence, Appellant argues his trial counsel was ineffective based on his alleged failure to investigate the actual state of the pillow, prior to entering into the stipulation with the state regarding the presence of blood on the pillow.

**{¶17}** It is important to note that Hanson avers she found the pillow in Maddox's crib. Her affidavit reads in relevant part:

> A few after [sic] the Sheriff's Department left [Appellant's trailer], I went to pack up some things for Maddox.
>
> I remember looking in Maddox's crib and thinking he might not need [the pillow] right now, and I just packed some clothes and a couple blankets for him.
>
> I packed those things in a tote bag and left.
>
> [My parents] and I went back to [Appellant's trailer] to clean up. We picked up Maddox's stuff from his room. We packed everything up – that included the [pillow]. We packed into Leah's car on March 22[, 2021]. The Sheriff's Department took those things from there.

(Hanson Aff., ¶ 3-6.)

**{¶18}** Prior to entering the stipulation at trial, the following exchange regarding the pillow took place during a discussion of the jury instructions:

PROSECUTOR:     We have one stipulation.  Are we going to go over the jury instructions?

THE COURT:      We will go over the jury instructions, yes. Sorry. What's the stipulation?

PROSECUTOR:     The stipulation would read -- and I have it written here -- that the parties agree and stipulate that [Appellant's] family gave custody of Maddox to Leah's sister, Ashlee Pitts.  On March 21st, 2021, Ashlee was given Maddox, as well as [the pillow], with apparent blood stains on the pillow.

THE COURT:      Okay.  You'll read that then?

PROSECUTOR:     With the Court's permission, I would read that.

THE COURT:      Yes.  Would that go in the jury instructions?

PROSECUTOR:     No.  This is just -- it would be technically a rebuttal witness for the State based on --

THE COURT:      Right.

PROSECUTOR:     It would just be -- instead of putting this witness on, it would take 10 seconds instead of 15 minutes.

THE COURT:      Got it.  You want to stipulate on record for the Jury?

PROSECUTOR:     Correct.

PROSECUTOR # 2:  We could call Ms. Pitts.

THE COURT:      Sorry.  My head is in the jury instructions.

| | |
|---|---|
| PROSECUTOR: | That's okay. |
| THE COURT: | We're going to go over jury instructions right now. |
| DEFENSE COUNSEL: | His sister has a picture of the [pillow]. I just want to make sure -- |
| PROSECUTOR: | It was the 21st? Is that what you're saying? |
| DEFENSE COUNSEL: | Yes. We'll just confirm that. |
| PROSECUTOR: | Yeah. If it's not the 21st, it is the 22nd. I thought it was the 21st. |
| THE COURT: | Could counsel approach to go over these jury instructions, and then I'll fix them, and we'll print off copies for everyone, and we'll get started. |

(Trial Tr., p. 637-639.)

{¶19} In considering the postconviction petition, the trial court concluded Hanson's affidavit lacked credibility. In assessing the credibility of the content of an affidavit, the trial court must consider: (1) whether the judge reviewing the postconviction relief petition also presided at the trial; (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person; (3) whether the affidavits contain or rely on hearsay; (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts; and (5) whether the affidavits contradict evidence proffered by the defense at trial. *State v. Shaw*, 2014-Ohio-5633, ¶ 15 (7th Dist.), citing *Calhoun* at 285.

{¶20} With respect to the credibility of the Hanson affidavit, the trial court opined:

The Court finds at least three of the [*Calhoun*] factors apply to [the Hanson affidavit]. The judge reviewing the postconviction relief petition is the same judge who presided over the trial, the affiant is [Appellant's] sister

and is highly interested in the success of the Petition, and the evidence contradicts the stipulation made by trial counsel, *after acknowledging that he was familiar with a picture of the [pillow] held by [Appellant's] sister.* Presumably, that picture was held by the affiant . . . as [Appellant] testified he only has one sibling. This is important to note for two reasons: one, [Appellant] alleges ineffective assistance of counsel for *failure to inquire or investigate* not for *failure to present evidence or call a witness,* and two, because the trial record indicates that defense counsel was aware of the picture held by [Hanson], but [the Hanson affidavit] does not address how trial counsel was aware of the picture if she didn't provide it to him, nor does she explicitly state that trial counsel failed to inquire of her or confirm the date. Additionally, the record reflects that trial counsel was aware that the State was prepared to call a witness to testify on the matter.

(Emphasis in original) (J.E., p. 9-10.)

{¶21} Appellant argues the trial court incorrectly weighted the *Calhoun* factors. To the contrary, we find the trial court did not abuse its discretion in concluding the Hanson affidavit was not credible.

{¶22} First, Appellant argues the trial court's reliance on the fact that the trial judge who ruled on the postconviction petition was the same judge who tried the case was misplaced. Appellant reasons that Hanson did not testify at trial, therefore the trial judge had no opportunity to gauge her credibility in person. However, Appellant's interpretation of the first *Calhoun* factor is unduly restrictive. Here, the trial court judge who ruled on the postconviction petition was vested with a thorough understanding of the facts adduced at trial, as well as a familiarity with both the testimonial and physical evidence. There is no question that the trial judge's knowledge of the case conferred upon her a greater ability to assess Hanson's credibility than a trial judge reviewing the cold record. Accordingly, we find that trial court did not abuse its discretion in giving weight to the first *Calhoun* factor.

{¶23} Of even greater import, Hanson is Appellant's sister and had a personal interest in overturning Appellant's conviction and her averments regarding the pillow are

directly contradicted by evidence proffered by the defense at trial.  The Hanson affidavit contradicts crime scene photographs admitted into evidence at trial.   According to Hanson, the pillow was located in Maddox's crib.  However, photographs taken at the crime scene depict the crib and its surroundings on the night of the fatal shooting. The pillow is not present in any of the photographs.  Further, Hanson concedes that she did not see the pillow in the crib until after the Sheriff's Department left Appellant's trailer on March 21, 2021.  Finally, the trial transcript establishes defense counsel entered the stipulation based on a photograph of the pillow taken by Hanson herself that supported Pitts' proposed testimony regarding the bloodstains.

**{¶24}**  Insofar as the trial court had the benefit of trying the criminal case, Hanson was a member of Appellant's immediate family, and the content of Hanson's affidavit directly contradicts the representations of defense counsel and certain photographic evidence offered at trial, we find the trial court did not abuse its discretion in discrediting her affidavit.  Accordingly, Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN FINDING THAT THE AFFIDAVIT OF CHELSSIE HANSON DOES NOT SUPPORT A CLAIM OF INEFFECTIVE ASSITANCE OF COUNSEL FOR FAILING TO INQUIRE OR INVESTIGATE.**

**{¶25}** Next, Appellant contends the Hanson affidavit, if believed, sets forth sufficient operative facts to establish substantive grounds for relief.  However, neither the Hanson affidavit nor Appellant's affidavit indicate the extent of defense counsel's pretrial investigation of the pillow, or attempt to explain defense counsel's representation at trial that the stipulation was predicated upon a photograph of the pillow in Hanson's possession.   Insofar as the record demonstrates defense counsel relied on the photograph when entering the stipulation, and Hanson and Appellant provide no explanation to the contrary, we decline to infer a failure to investigate from a silent record.  Consequently, Appellant failed to demonstrate defense counsel's performance was deficient.

{¶26} Further, Appellant's actions subsequent to the fatal shooting contravene his alleged belief that Leah had murdered Maddox. Appellant conceded at trial that he did not examine Maddox to determine whether he was injured or dead before or after Appellant shot Leah. Appellant further conceded that he did not tell his mother, his former girlfriend, or investigators that he believed Leah had murdered Maddox before he shot her. Even assuming arguendo that there was no blood on the pillow, there is compelling evidence in the record that belies Appellant's contention that he thought Maddox was dead when he fatally shot Leah. As a consequence, we find Appellant suffered no prejudice even assuming the Hanson affidavit was credible.

{¶27} Accordingly, we find the trial court did not abuse its discretion in finding the affidavit, if believed, did not establish substantive grounds for relief. Therefore, Appellant's second assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN RULING THAT THE AFFIDAVITS OF [APPELLANT] AND HIS MOTHER DO NOT SUPPORT A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO MITIGATE FELONY LEVEL AND SENTENCING.**

{¶28} Appellant offers his own affidavit as well as the affidavit of his mother to establish that medical records exist regarding Appellant's mental health, which were not offered at trial. The medical records are not attached to either affidavit.

{¶29} There is evidence in the record that defense counsel subpoenaed some of Appellant's mental health records. Based on the subpoenas, Appellee argues Appellant's third assignment of error is barred by res judicata. Appellant counters that the subpoenas show defense counsel subpoenaed medical records relating to Leah, not Appellant.

{¶30} Appellant correctly argues subpoenas for Genesis Hospital and Wheeling Hospital requested only Leah's medical records. However, the subpoena for Dr. Ostric Malone-Prioleau requested the medical records of both parties. Further, the subpoenas for Miles D. Fries and Peter Kurelac requested records pertaining exclusively to Appellant.

{¶31} Ms. Thompson avers that medical records exist with respect to Appellant from Genesis Psychiatric Services, St. Mary's, Dr. Malone-Prioleau, and the West Virginia Department of Health and Human Resources, which detail Appellant's substance abuse, his internment in a mental facility, and a possible diagnosis of schizophrenia. According to Appellant's handwritten affidavit, he was diagnosed with bipolar disorder and recalls receiving a prescription for Vraylar. He was admitted to a mental health facility in 2012 and 2018.

{¶32} The subpoena for Genesis Psychiatric Services requested Leah's medical information only, and no subpoena was issued for the West Virginia Department of Health and Human Services. In order to establish the existence of those records, Appellant relies on his mother's affidavit, which is evidence outside the trial court record. As the ineffective assistance claim relating to Appellant's mental health records is predicated upon evidence de hors the record, and could not be established exclusively upon evidence in the trial record, res judicata does not bar Appellant's third assignment of error.

{¶33} Nonetheless, we find the trial court did not abuse its discretion in concluding Appellant failed to establish substantive grounds for relief based on his mental health records. Neither Appellant nor Ms. Thompson explains any basis of knowledge regarding defense counsel's investigation of Appellant's medical records. Further, in the absence of the medical records, the alleged impact on Appellant's felony level and mitigation is speculative. Accordingly, this Court finds the trial court did not abuse its discretion in concluding the petition did not establish substantive grounds for relief.

{¶34} Based on the foregoing analysis, we find Appellant's third assignment of error has merit with respect to the trial court's conclusion on res judicata, but has no merit with respect to the substantive claim of ineffective assistance. The trial court did not abuse its discretion in rejecting Appellant's argument regarding his mental health records.

## ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT ERRED IN DENYING [APPELLANT'S] MOTION TO PRODUCE RECORDS.**

{¶35} "There is no requirement of civil discovery in postconviction proceedings." *State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office*, 1999-Ohio-314. The postconviction statute does not provide a right to discovery. *Id.* Thus, discovery is not required before determining whether an evidentiary hearing is warranted by a petition. *State v. Herring*, 2004-Ohio-5357, ¶ 152 (7th Dist.) (no statutory right to discovery).

{¶36} Appellant correctly argues the trial court misstated the date that the motion to produce records was filed, and relied upon that misstatement to conclude that the motion was untimely filed. Nonetheless, we find Appellant had no right to discovery and has failed to advance an argument supporting the conclusion that this case presents an extraordinary circumstance where discovery should have been permitted. Of practical concern, Appellant did not require an order of the Court to obtain his medical records. Accordingly, we find the trial court did not abuse its discretion in overruling the motion for an order to produce records in aid of postconviction petition, and Appellant's fourth assignment of error has no merit.

## CONCLUSION

{¶37} For the foregoing reasons, the judgment entry of the trial court is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 23 NO 0513

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Noble County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**